**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
HELEN EBBERT, PAMELA EDWARDS,
ISABELLA MINNECI, WENDY MURO,
FRANCES KAMERER, LORI CONKLIN,
and all others similarly situated,

                                Plaintiffs,                          **MEMORANDUM**
                                                       **AND ORDER**

        - against -

                                                CV 05-5445 (FB) (AKT)

NASSAU COUNTY, NASSAU COUNTY
POLICE DEPARTMENT, NASSAU COUNTY
CIVIL SERVICE COMMISSION,
THOMAS R. SUOZZI, in his official capacity,

                                Defendants.
-----------------------------------------------------------X

**A. KATHLEEN TOMLINSON,  Magistrate Judge:**

**I.**      PRELIMINARY STATEMENT

      Plaintiffs, as individuals and representatives of a class, commenced this action against

Defendants Nassau County, the Nassau County Police Department, and the Nassau County Civil

Service Commission alleging violations of the Equal Pay Act, 29 U.S.C. §§ 206(d), *et seq*. and

the New York State Equal Pay Act, N.Y. Lab. Law §§ 194, *et seq*.  Plaintiffs have also sued

Defendant Thomas R. Suozzi, in his official capacity as County Executive, based upon alleged

gender discrimination in violation of 42 U.S.C. § 1983.  By Stipulation and Order dated

August 3, 2006, this action was bifurcated to separate the issue of liability from damages [DE

20].  On August 13, 2007, District Judge Block granted Plaintiffs' motion to proceed as a

collective action for violations of the Equal Pay Act and further certified the lawsuit as a class

action for alleged violations of 42 U.S.C. § 1983 and the New York State Equal Pay Act [DE 67].

Before the Court now is Plaintiffs' motion (1) to preclude the Initial Expert Report and Rebuttal Expert Report (collectively, "the Reports") of Defendants' expert witness, Gerald Barrett, Ph.D., J.D. and (2) to preclude Dr. Barrett from testifying at trial. The thrust of Plaintiffs' argument is that the Reports are permeated with impermissible legal conclusions rather than the analysis the expert was hired to perform. Defendants deny this assertion and argue that the Barrett Reports "frame his analysis and discussion of technical, professional and statistical issues for the Court." Def. Mem. at 2. As an alternative to full preclusion, Plaintiffs request that the Court strike certain portions of the Reports and preclude Defendants' expert from testifying at trial about those corresponding segments. For the reasons set forth below, Plaintiffs' motion is GRANTED in part and DENIED in part.

## II.  THE FACTUAL CONTEXT

The factual background of this case has been set forth in previous Orders of the Court, familiarity with which is assumed. Only those facts necessary to determine the instant motion are included here. Plaintiffs and their representative classes are employed by Nassau County as Police Communications Operators ("PCOs") and Police Communications Operator Supervisors ("PCOSs"). Plaintiffs allege that Defendants discriminated against them by paying them lower wages than male employees who performed substantially equal work. In particular, Plaintiffs assert that female PCOs and PCOSs were paid lower wages than male Fire Communication Technicians ("FCTs") and Fire Communication Technician Supervisors ("FCT IIs"). At issue in this case is whether PCOs and PCOSs performed "equal work" to FCTs and FCT IIs and, specifically, whether those positions

required "equal skill, effort, and responsibility, and [were] performed under similar working conditions." 29 U.S.C. § 206(d)(1).

Defendants retained Gerald Barrett, Ph.D., J.D. ("Dr. Barrett") as an expert in connection with this case.[1] Plaintiffs seek to strike Dr. Barrett's Reports and to preclude his testimony at trial. According to Defendants, Dr. Barrett is to testify as an expert "for the purpose of assisting the trier of fact in evaluating the jobs performed by the plaintiffs and those of their comparators." Def. Mem. at 2. Plaintiffs' expert, Kathleen K. Lundquist, Ph.D. ("Dr. Lundquist"), filed a Rebuttal Expert Report[2] responding to Dr. Barrett's findings and opinion. Subsequently, Dr. Lundquist filed her own Expert Report[3] on behalf of Plaintiffs, to which Defendants served a Rebuttal Expert Report from Dr. Barrett.[4] Plaintiffs maintain that Dr. Barrett's Rebuttal Report suffers from the same infirmity as his initial presentation. As such, Plaintiffs move to strike both reports. Alternatively, Plaintiffs

---

[1] Defendants contend that Dr. Barrett is an expert in "job analysis, job evaluation, pay systems, Industrial-Organizational Psychology, and human resource management." Def. Mem. at 4-5. In addition to a Ph.D. in Industrial Psychology from Case Western University, Dr. Barrett also received a J.D. from the University of Akron's School of Law. *See* Dr. Barrett's Initial Expert Report, attached as Exhibit 1 to the Affidavit of Herbert Eisenberg filed in support of Plaintiff's Motion to Preclude the Testimony and Evidence of Dr. Gerald Barrett ("Eisenberg Affidavit") at 10 [DE 78, 81]. Subsequent references to Dr. Barrett's Initial Expert Report are designated "Barrett Rep. I at ___."

[2] Dr. Lundquist's Rebuttal Expert Report is annexed as Exhibit 2 to the October 30, 2007 letter of Plaintiffs' counsel [DE 86].

[3] Dr. Lundquist's Initial Expert Report is annexed as Exhibit 1 to the October 30, 2007 letter of Plaintiffs' counsel.

[4] Dr. Barrett's Rebuttal Expert Report is annexed as Exhibit 2 to the Eisenberg Affidavit [DE 78, 81]. References to Dr. Barrett's Rebuttal Expert Report are designated "Barrett Rep. II at ___."

request an Order that "edits" the offending portions of Dr. Barrett's Reports and that limits the content of his trial testimony accordingly. *See* Pl. Reply Mem. at 12-16.

## III.   THE PARTIES' CONTENTIONS

With respect to the current and putative class members, Plaintiffs allege that Defendants have discriminated against them by "paying them wages substantially lower than the wages paid to men for the performance of substantially equal work." in violation of the Equal Pay Act and New York State Labor Law § 194, *et seq.*   Pl. Mem. at 1.  According to Plaintiffs, Dr. Barrett's Reports are impermissibly "dominated by his opinions regarding legal standards and conclusions" and his "factual opinions . . . have been irreparably tainted by his impermissible legal analysis." *Id.* at 2.  Plaintiffs argue that Dr. Barrett's Reports contain a "selective analysis of the Equal Pay Act jurisprudence and [an] application of selective facts to those opinions and conclusions" that will "impermissibly confuse the appropriate legal standards for the finder of fact." *Id.* at 2, 9.   Ultimately, Plaintiffs maintain, "[r]ather than make a factual assessment of [the] jobs in question, Dr. Barrett seeks to decide the case for the trier of fact and function as judge and jury." *Id.* at 2.  As such, Plaintiffs assert, Dr. Barrett's testimony is inadmissible.

Taking Dr. Barrett's Reports as a whole, Plaintiffs argue that the reports

1.      contain conclusions based more on legal analysis than on an actual assessment of the jobs in question;

2.      contain specific sections devoted to Dr. Barrett's assessment of the applicable legal standards;

3.      set forth legal conclusions about the viability of the Plaintiffs' claims; and

4.      provide legal analysis regarding the scope and parameters of the Equal Pay Act.

In response, Defendants assert that Dr. Barrett's testimony should not be precluded, but rather be deemed admissible for the purpose of assisting the trier of fact in evaluating the jobs performed by Plaintiffs and those of their comparators.   Directing many of their arguments to the principles enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137 (1999), Defendants claim that Dr. Barrett's Reports are relevant and that his underlying methodology is scientifically valid.  Def. Mem. at 3.  Moreover, Defendants maintain that "Dr. Barrett does not attempt to draw any legal conclusions." *Id.* at 9.   As to Plaintiffs' argument that Dr. Barrett draws legal conclusions regarding the Equal Pay Act, Defendants aver in their opposition papers and reiterated at oral argument that Dr. Barrett is simply repeating conclusions from his previously published and peer reviewed research and is "only providing a framework for his analysis" based upon those prior publications. *Id*.

## IV.   STANDARD OF REVIEW

### A.      Motions *In Limine*

"The purpose of an in limine motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir.1996) (internal quotation marks omitted); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. L.E. Myers Co. Group*, 937 F. Supp. 276, 283 (S.D.N.Y.1996); *Highland Capital*

*Mgmt., L.P. v. Schneider*, 379 F. Supp.2d 461, 467 (S.D.N.Y. 2005). When a party moves to preclude evidence by means of an *in limine* motion, the court is required to determine preliminarily under Fed. R. Evid. 104 whether the evidence is admissible. *See Highland Capital Mgmt., L.P.*, 379 F. Supp.2d at 467 (citing *Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, No. 01-CV-3796, 2004 WL 1970144, at *4 (S.D.N.Y. Sept. 3, 2004). "[O]nly when the evidence is clearly inadmissible on all potential grounds" should such evidence be excluded on a motion *in limine*. *Commerce Funding Corp.*, 2004 WL 1970144 at *4 (citing *Baxter Diagnostics, Inc. v. Novatek Med., Inc.*, No. 94-CV-5520, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998)); *accord Sec. Exch. Comm'n v. U.S. Envtl, Inc.*, No. 94-CV-6608, 2002 WL 31323832, at *2 (S.D.N.Y. Oct.16, 2002). It should be noted that an *in limine* ruling "is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the . . . proffer." *Highland Capital Mgmt., L.P.*, 379 F. Supp. 2d at 467 (quoting *Luce v. United States*, 469 U.S. 38, 41 (1984)).

### B.  <u>Admissibility of Expert Testimony</u>

A court maintains full discretion to determine whether expert testimony will be admitted. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (citing *United States v. Schwartz*, 924 F.2d 410, 425 (2d Cir. 1991)). The Federal Rules of Evidence "provide a liberal standard for the admissibility of expert testimony." *United States v. Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003) (citing *Daubert*, 509 U.S. at 588). Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.[5]   Accordingly, "[o]ne of the fundamental requirements of Rule 702 is that the proposed testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (quoting Fed. R. Evid. 702); *accord Lippe v. Bairnco Corp.*, 288 B.R. 678, 685 (S.D.N.Y. 2003), *aff'd*, 99 Fed. Appx. 274 (2d Cir. May 17, 2004); *see also In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 68 (S.D.N.Y. 2001) ("As Rule 702's plain language shows, the opinion of an expert witness is *only* admissible if it (1) assists the trier of fact in (2) understanding the evidence or determining a disputed fact.") (emphasis in original).   Expert testimony that will not assist the fact-finder, and would thus be inadmissible under Rule 702, includes testimony that will "'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *Duncan*, 42 F.3d at 101 (*quoting United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)); *accord United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999).

---

[5]      In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 597 (1993), the Supreme Court held that trial courts must perform a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  The Supreme Court's subsequent decision in *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) clarified that *Daubert*'s "general 'gatekeeping' obligation [ ] applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."  (citing Fed. R. Evid. 702).  The standard set forth in Rule 702 embodies both of these principles.  *See Highland Capital Mgmt., L.P.*, 379 F. Supp. 2d at 467-68.

Although Federal Rule of Evidence 704 provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," the Second Circuit has noted that Rule 704 has not "lower[ed] the bar so as to admit all opinions." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (quoting Fed. R. Evid. 704 Advisory Committee's note) (internal quotation marks omitted). Courts in this Circuit have repeatedly held that while an expert "may opine on an issue of fact within the jury's province," an expert "may not give testimony stating ultimate legal conclusions based on those facts." *Bilzerian*, 926 F.2d at 1294; *see also DiBella v. Hopkins,* 403 F.3d 102, 121 (2d Cir. 2005) (expert inappropriately drew legal conclusions by opining that Plaintiff's actions amounted to extortion); *United States v. Scop*, 846 F.2d 135, 142 (2d Cir.), *rev'd in part on other grounds*, 856 F.2d 5 (2d Cir. 1988) (expert witness statement "embodying legal conclusion exceeded the permissible scope of opinion testimony under the Federal Rules of Evidence"); *Hygh*, 961 F.2d at 363 ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion"). Such findings are based on the premise that while "an expert might be uniquely qualified by experience to assist the trier of fact, he is not qualified to compete with the judge in the function of instructing the jury." *Hygh*, 961 F.2d at 364.

Finally, as with all testimony, an expert's testimony must bear some relevance to an issue in the case. *See, e.g., United States v. Cruz*, 363 F.3d 187, 192 (2d Cir. 2004); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002); *United States v. Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991); Fed. R. Evid. 401. Relevant evidence is defined as "'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action

more or less probable than it would be without the evidence.'" *United States v. Onumonu*, 967 F.2d 782, 786 (2d Cir. 1992) (quoting Fed. R. Evid. 401 ).

Even if an expert's testimony meets the requirements of Rules 702 and 704, and is deemed relevant, a court still retains discretion to exclude that expert's testimony if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403; *see also United States v. Tapia-Ortiz*, 23 F.3d 738, 742 (2d Cir. 1994); *United States v. McBride*, 786 F.2d 45, 49 (2d Cir. 1986); *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993).

## V.   D<small>ISCUSSION</small>

Initially, the Court notes that Defendants devote a substantial part of their argument to defending Dr. Barrett's credentials and qualifications as an expert. The Court finds it unnecessary to address these arguments because Plaintiffs' objections to Dr. Barrett's Reports and testimony are not challenges to his credentials, but rather objections to what Plaintiffs see as impermissible legal advocacy.

Dr. Barrett's expert testimony, according to Defendants, is being proffered in this case "to provide technical and specialized knowledge in the area of job evaluation." Def. Mem. at 1. Defendants assert that his testimony is directed to responding to Plaintiffs' allegations, among other things, that Defendants have violated the Equal Pay Act and "one of the elements of the claim is that the jobs performed by the plaintiffs and those performed by comparators are substantially similar." *Id*. Plaintiffs do not appear to have any quarrel with Dr. Barrett's being presented for this stated

purpose.  The disagreement arises in the manner in which this representation is embodied in the actual Reports — and Plaintiffs' challenge to what constitutes admissible information and conclusions proffered by Dr. Barrett.

_____Dr. Barrett has worked in the field of human resource management and industrial-organizational psychology for over 40 years, including 22 years as a professor at the University of Akron where he served as chairman of the Psychology Department.  Barrett Rep. I at 10.  He describes his specialties as including "Industrial-Organizational Psychology, human resource management, job analysis, job evaluation and pay systems." *Id.* at 9.  In addition to obtaining a Ph.D. in Industrial Psychology and a J.D. from the University of Akron School of Law, Dr. Barrett has taught numerous courses and authored or co-authored "over 150 professional publications and four books in the area of Industrial/Organizational Psychology." *Id*. at 10.  Further, Dr. Barrett notes that

> [i]n addition to my applied experience in job evaluation and job analysis projects, I have published over 15 peer-reviewed articles that deal with issues of job analysis and job evaluation.  This has included articles dealing with the issue of potential sex bias in job evaluation systems and also the use of job evaluation to address pay equity claims.

*Id*. at 11.  The job analysis and job evaluation issues pertinent to Dr. Barrett's retention in this matter are set forth initially in the "Executive Summary" section of his Initial Report where he lists the fourteen conclusions he has drawn in addressing the issues raised in Plaintiffs' Complaint.   A  group of these conclusions forms the basis for Plaintiffs' motion to preclude Dr. Barrett's Reports and anticipated trial testimony.  __

The question before the Court is whether the substance of Dr. Barrett's Reports is admissible in so far as the Reports reflect the testimony that Dr. Barrett would offer as a witness at trial. More particularly, the key here is whether Dr. Barrett's testimony bears some relevance to one or more issues in the case and, if the answer to that inquiry is "yes," then what "facts" does Dr. Barrett help a jury to understand? The central issue in this case is whether the four jobs being compared are substantially similar in terms of skill, effort and responsibility. To answer these questions, then, it is necessary to address the admissibility of various sections of the Reports as well as Plaintiffs' request that the Reports either be stricken or, in the alternative, that they be edited to exclude what Plaintiffs claim are legal conclusions and misleading legal advocacy.

## A. Admissibility of The Barrett Reports

### 1. The Initial Report

The primary issue in this case is whether PCOs and PCOSs perform work that is equal to that performed by FCTs and FCT IIs. In the "Executive Summary" found at the beginning of his Initial Report, Dr. Barrett states the following:

> The purpose of this report is to address the issues raised in the Plaintiffs' complaint filed November 18, 2005 in the matter of *Ebbert, et al. v. Nassau County*, Case No. CV-05 5445, United States District Court, Eastern District of New York. The expert opinions expressed in this report are based upon professional guidelines, standards, applicable laws, relevant court cases, personal observations, and my review of the documents provided to me. In preparing this report, I have also relied upon my experience in Industrial-Organizational Psychology, human resource management, job analysis, job evaluation and pay systems.

Barrett Rep. I at 6. Dr. Barrett's statement that his opinion is based upon "applicable laws" and "relevant court cases," standing alone, does not disqualify his testimony. Dr. Barrett brings his academic and professional expertise to the table with him. However, what is equally clear is that his job here is ***not*** to provide a legal "framework" as Defendants' counsel continues to emphasize, nor to discuss any legal parameters for the opinion he is rendering, which itself must be a distillation of the facts established by other proven and admissible evidence, *see Malletier v. Dooney & Bourke, Inc*., 525 F. Supp. 2d 558, 678 (S.D.N.Y. 2007) (citing *Highland*, 379 F. Supp. 2d at 468-69) and conclusions based on those facts – nothing more. The Court is cognizant of the fact that Dr. Barrett has a law degree in addition to his other academic credentials. Although his legal training may provide a context for his thought processes, he is not free to share that information with a jury because (1) he was not hired as an attorney to render legal opinions and (2) this type of information is outside the scope of his duties as a retained expert in job analysis, job evaluation, pay systems, and issues of potential sex bias in job evaluation systems. His job is to assist the jury in understanding the facts – in this case, to shed light on a municipal pay system operating in the County as well as various job titles which impact that pay system, so that jurors can sort out the facts for themselves and come to a conclusion. As noted previously, Defendants themselves have stated that Dr. Barrett's job here is "to provide technical and specialized knowledge in the area of job evaluation." Def. Mem. at 1

One paragraph of the "Executive Summary" highlights this distinction with some clarity:

> The basic complaint of the female Plaintiffs working in the Police Communications Bureau was that they performed equal work as compared to the males working in the Fire Communications Center (FIRECOM).

> The analysis was complicated by the fact that the Plaintiffs never identified specific male comparators whom they claimed were performing equal work and receiving higher compensation. The word comparator has been described as a bit of legalese in context of Equal Pay Act which has convenience, if not elegance [*Hein v. Oregon College of Education*, 718 F.2d 910 (9th cir. 1983)]. Despite this, there were definite conclusions that could be reached.

Barrett Report I at 6. Here, Dr. Barrett concludes there is a flaw in the analysis performed by Plaintiffs and that the purported "flaw" has a factual basis, namely, Plaintiffs' failure to identify specific "male comparators" for purposes of determining whether the work at issue was "equal" by comparison. However, Dr. Barrett strays from the appropriate parameters by posturing about the term "comparator" and acknowledging it as "legalese in the context of Equal Pay Act . . ." It is not within Dr. Barrett's purview to define legal terms as part of an expert report or expert testimony. *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) (finding admission of expert testimony improper when witness "repeatedly gave his conclusions as to the legal significance of various facts adduced at trial" that were "based . . . on his examination of documents and correspondence . . . which were equally before the judge and jury" because such testimony "amounts to no more than an expression of [his] general belief as to how the case should be decided"). As such, this latter portion does not belong in the expert report and is clearly an area which Dr. Barrett will not be permitted to address in any trial testimony.

In the opening portion of the Initial Report, Dr. Barrett summarizes the fourteen "conclusions" contained there. Plaintiffs' counsel characterizes the second "conclusion" as an example of improper content. That conclusion states:

13

Second, to complicate the analysis, at least 15% of the PCOs were male during this applicable period of time. So, we have females who perform different work under the PCO title and males with the PCO title performing work on the 911 Floor.

Barrett Rep. I at 7. Plaintiffs argue that this conclusion relates to Dr. Barrett's legal argument that since 15% of the PCOs are male, that position is not a "female job" subject to the EPA. Pl. Mem. at 6. This argument becomes even more of an issue in subsequent sections of the Initial Report. Plaintiffs assert the following:

[t]hat there are male and female PCOs does nothing to illuminate the PCO and FCT jobs. The legal consequences of male PCOs and the issue of the scope of the Equal Pay Act is an issue much in dispute between the parties . . . Whether men and women perform the same job of PCO has no bearing with the expert analysis he [Dr. Barrett] is purportedly offering – whether the jobs in question are substantially similar. Moreover, case law does not support Dr. Barrett's conclusion that the job must be exclusively female to fit within an appropriate Equal Pay Act analysis.

*Id*. (citation omitted). The Court agrees. Later in his Initial Report, Dr. Barrett takes the further step of stating that the PCO position is not subject to the EPA. In doing so, he strays beyond the realm of facts and proffers a legal conclusion. By contrast, most of the other fourteen "conclusions" as they are stated in this segment are fact-based and fall within the appropriate parameters for the report, based upon the task for which Dr. Barrett was retained. However, this segment is only a "summary" and the Court must look further to the remaining substantive contents of the Reports.

In approaching this issue, the Court looks to guidance offered by other courts in the Second Circuit as well as the Circuit itself . In *Highland Capital Management, L.P. v.*

*Schneider*, 379 F. Supp. 2d 461, 462 (S.D.N.Y. 2005), a case presenting a very similar scenario to this action, the defendants moved *in limine* for an order excluding the testimony of the plaintiff's expert witness.  The defendants in *Highland* objected to the admissibility of  the expert's  reports and testimony because both contained a series of legal conclusions and opinions setting forth the state of the law and, in the expert's view, how the law ought to be applied to the facts of the case.  *Id.* at 466-67.  The court in *Highland*  reviewed the expert's report and found that it contained multiple discussions of  federal securities law, including citations to statutes and cases.  *Id.* at 470.  The court held  that the expert's application of "generic legal principles" to the facts of the case was tantamount to the expert proffering his opinion that the defendant had violated federal securities laws.  *Id.*   Finding the expert's testimony and report inadmissible, the court reasoned that they "usurp[ed] the jury's role in finding the facts and applying those facts to the law as instructed by the court. . . . There is no reason why a jury in this case could not apply the law to the facts it finds to determine whether there has been a violation of the securities laws."  *Id.* (citing *Marx & Co., Inc.*, 550 F.2d at 510).

  *Highland* provides a helpful road map for parsing Dr. Barrett's Reports in the context of Plaintiffs' allegations of improper expert testimony.  As noted, the court in *Highland* reviewed the contested expert report and separated the offending provisions into three categories: (1) discussion of applicable laws, including citations to statutes and cases; (2) application of generic legal principles to the facts of the case; and (3) offering of opinion that there is or is not a violation of the law.  *Highland*, 379 F. Supp. 2d at 468-473.  The Court now looks at each of these categories as applied to the Barrett Reports.

**a**. *Discussion of applicable laws, including citations to statutes and cases:*

Various sections of the Initial Report discuss the Equal Pay Act, the Department of Labor Bulletin and various cases. The Court directs attention to the following examples:

- "As discussed in the next section, my analysis suggests this is a unique situation in terms of equal pay act cases." [Rep. I at 13]

- "In the typical equal pay case involving a comparison across different jobs, the scenario involves a male or males performing one job, Job A, and a female or females performing a second job, Job B, with the allegation being that the jobs performed by females are equal to or similar to those performed by males, although the male dominated job receives higher pay." [Rep. I at 13]

- "In my view, the Equal Pay Act and the DOL Interpretation of the Act (1971) contemplated all males holding Job A and all females holding Job B where there is an alleged difference in pay between the two jobs. The legislative history of the Equal Pay Act and some court decisions indicate that differences in pay between categories of employees that contain both men and women are not covered by the Equal Pay Act." [Rep. I at 14]

- "For the purposes of the Equal Pay Act their LSAT scores are not relevant. Clearly, the two attorneys are not performing the same jobs and would fall outside the preview [*sic*] of the Equal Pay Act." [Rep. I at 16]

- "As another example, if our two hypothetical attorneys have identical LSAT scores and the higher paid female attorney handles more complex corporate federal tax cases, while the male attorney handles the simpler individual federal tax cases, then again, the LSAT scores have no bearing on compensation and are not relevant to equal pay issues." [Rep. I at 17].

- "Job evaluation instruments do not provide measures of a number of factors which are either external to the job, such as performance, or internal, but judged as not being compensable (*EEOC v. Akron National Bank and Trust Company*, 1980) ..." [Rep. I at 19]

- "The Equal Pay act (EPA) was enacted in 1963. In 1971, the Department of Labor (DOL) issued an Interpretive Bulletin based upon the legislative history of the Equal Pay Act of 1963, professional publications, and the court cases decided in that time. I have basically followed the framework laid out in the Interpretive Bulletin in this report. The content of these bulletins is reviewed and summarized below." [Rep. I at 23]

- "Section 800.119 of the DOL Interpretive Bulletin states that the EPA prohibits an employer from paying employees of the opposite sex differently for 'equal work on the job' described as equal in terms of 'skill, effort, and responsibility and performed under similar working conditions' (p. 13). Furthermore, in applying these separate tests of equality it is necessary to 'scrutinize the job as a whole (p. 13)... The standards are also clear in stating that when only men are employed in the establishment in one job and only women in a different job the equal pay standards are not to be applied. For example, the DOL Interpretive Bulletin states that 'the [equal pay] standard would not apply where only women are employed in clerk typist positions and only men are employed in jobs as administrative secretaries if the latter really require substantially different duties." [Rep. I at 24-25]

- "Sections 800.140 - 800.151 of the DOL Interpretive Bulletin examine the four exceptions to the Equal Pay Act. If the jobs in question are determined to be equal based on the required skill, effort, responsibility, and working conditions in which the job is performed, the awarding of differential pay still could be justified if based upon one of the four exceptions to the Equal Pay Act. Section 6(d)(1) of the Equal Pay Act outlines three specific exceptions and one broad exception to the requirement that employees performing equal work be paid equally regardless of sex. The exceptions to the Equal Pay Act are reviewed and described below. . . ." [Rep. I at 27]

- "Framework from Court Decisions Relevant to Present Analysis

    Based on the Supreme Court case of *Corning Glass Works v. Brennan* (1974) – the equal pay act is based upon traditional job evaluation principles involving skill, effort, responsibility, and working conditions.

    There are basic principles which are informative and provide a framework for my analysis. These were derived from a review of selected Equal Pay Act court cases. Appendix F contains tables of selected court cases from which these principles were derived. . . ." [Rep. I at 28-30]

- "Appendix F:  Selected Court Cases Dealing with Equal or Similar Work Under the Equal Pay Act" [Rep. I]

### b.   *Applying generic legal principles to the facts of the case:*

The Initial Report goes on to make an assessment of the legal principles and how they are applied to the PCO, PCOS, FCT I and FCT II positions.  The following examples are illustrative:

- "In addition, I will discuss the four exceptions to the Equal Pay Act.  I will then explore to what degree those exceptions explain the wage differences between PCOs and FCT Is and between PCOSs and FCT IIs." [Rep.  I at 12]

- "It was claimed that skill-based job analysis can help establish the content validity of post-training certification measures where legal defensibility becomes an issue.  While I have never read any court cases or professional publications which would support this point of view, the important point is that the procedure was not advocated to determine job salaries." [Rep. I at 15]

- "The development of the principles was based upon three sources. . . . Third, I reviewed applicable court cases." [Rep. I at 18]

- " . . . In addition, even if two jobs were judged to be sufficiently similar, the awarding of differential pay could still be justified if based upon one of the four exceptions to or defenses in the Equal Pay Act.  These are usually termed affirmative defenses.  At a later point, I will then explore to what degree those exceptions explain the wage differences of PCOs to FCT Is and PCOSs to FCT IIs." [Rep. I at 32]

- "It is fundamental in Equal Pay Act claims that you are analyzing the actual job being performed by the incumbents, not their job titles nor their personal characteristics, which are not required for the job.  In fact, having supervisor skills not required for the job has no weight in Equal Pay Act claims. . . ." [Rep. I at 57]

### c.    *Offering an opinion that there is/is not a violation of the law:*

- "I can only state that there is possibly a legal analysis and argument that PCOs can not be compared with the FCT is because both males and females are employed as PCOs. That issue is beyond the purview of this report and I will assume that the comparison poses no legal issues." [Rep. I at 14]

- "I have previously critiqued that approach (Barrett, 1991); Barrett & Doverspike, 1989) and labeled it a 'smoking gun' (Barrett, 1991, p. 100) for a prima facie violation of the Equal Pay Act." [Rep. I at 16]

- "The previous chapters have illustrated that there are major differences between the PCOs and FCT Is in terms of job tasks, skills, effort, responsibility, and working conditions. Thus, the jobs are quite different. However, even if the two jobs were adjudged to be sufficiently similar, the awarding of differential pay still could be justified if based upon one of the four exceptions to the Equal Pay Act. At this point, I will explore to what degree those exceptions explain the wage differences of PCOs and FCT Is. . . ." [Rep. I at 97, 101]

- "Thus, I can conclude, there is no evidence to support an allegation of a violation of equal pay for the comparison of FCT I to PCO. There is also no evidence to support an allegation of equal pay for the comparison of FCT II to PCOS." [Rep. I at 106]

- "I found no evidence of disparate treatment which was adverse to female PCOs or PCOSs. The essence of disparate treatment is that one individual is treated differently than another individual." [Rep. I at 106]

- "The overtime pay was actually higher for some PCOs and PCOSs that [*sic*] it was for FCT Is and FCT IIs. Clearly, there was no disparate treatment in overtime disfavoring females. In fact, they appeared to have a distinct advantage." [Rep. I at 107]

None of the foregoing statements have any place in any expert report. The content begs the question why these assertions are even necessary for an analysis of the similarity/dissimilarity of the positions at issue in this case.

## 2.     The Rebuttal Report

These same infirmities persist in the Rebuttal Report.  Without quoting verbatim from the respective portions of the rebuttal report, the Court draws the parties' attention to the following designations in the rebuttal report which reflect the same impermissible legal discussion and conclusions:

- page 5, second and third full paragraphs;

- page 7, first paragraph and first sentence of the second  paragraph;

- page 10, last two sentences;

- page 11, second full paragraph;

- page 12,  first sentence of the last paragraph;

- page 28, sentence beginning "These have been routinely upheld . . .";

- page 47, Table VI-1 entitled "Steps in Determining if Violation of Equal Pay Act";

- page 48, last full paragraph and page 49, first full paragraph

- various portions of subsections entitled "Topic 7. Salary Difference Between Plaintiffs and Comparator Males"; "Topic 8. Alleged Disparate Treatment"; "Topic 9. Overtime Compensation"; and "Topic 10. Work Behavior of Each Plaintiff Compared With Male Comparator";

- pages 70-78, Tables VIII-1 and VIII-2;

- various portions of  subsections entitled "Topic 15. Relevance of Male PCOs" and "Topic 16. Counterfactual Analysis" on pages 79-80;

- page 94,  first and second paragraphs;

- page 95,  first paragraph;

- Appendix C   [Rep. II]

The foregoing lists are by no means exclusive or exhaustive.  For example, it should be noted further that Dr. Barrett, on multiple occasions, makes reference to legal terms such as "disparate treatment" (*see, e.g.*, Rep. I at 106, 107; Rep. II at 74, "Topic 8") and "comparable worth" (Rep. II at 7, 48-49), none of which are appropriate in these Reports.  Moreover, neither disparate treatment nor comparable worth are asserted as the basis of claims in the Complaint.  Likewise, there are other statements on the same topics bearing the same defects in the Reports that are not specifically delineated here but which are nonetheless encompassed by this Memorandum and Order.  The Court also finds that certain portions of Dr. Barrett's deposition responses involve the same problematic content.  *See, e.g.*, Barrett Dep. Tr. at 30-31 and 294-295, annexed as Exhibit A to the Affidavit of Herbert Eisenberg in Further Support of Plaintiff's Motion to Preclude Expert Evidence.

Contrary to Defendants' assertions, the foregoing statements extend far beyond an assessment of the PCO, PCOS, FCT I and FCT II positions at issue in this case.  Defendants attempt to justify inclusion of this information by noting that Dr. Barrett has "published numerous articles on the interface between Industrial Organizational Psychology and the Law." Def. Mem. at 5.  No one disputes this fact, but the statement misses the point, namely, that this is not the task for which Dr. Barrett was proffered as an expert in this case.  Likewise, Defendants assert that Dr. Barrett has "developed and presented Ph.D. courses for over 20

years in 'Personnel Psychology and the Law' and 'Job Evaluation and Equal Pay.'" *Id.* This case is not a course in a doctoral program. Rather, the scope of Dr. Barrett's review is to assist a jury in understanding the facts placed in evidence.

Defendants also seek to diminish the cases relied upon by Plaintiffs which support Plaintiffs' argument that Dr. Barrett's Reports and testimony are tainted and should therefore be discarded. In particular, Defendants argue that *United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006), *United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994), and *United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) are inapposite and "far removed from Dr. Barrett's report," even though Defendants do not explain how this is so. Def. Mem. at 6. Defendants also emphasize the fact that these are three *criminal* cases, implying that they should be overlooked for that reason, although no explanation is given to justify that position. In any event, there is little if any difference in the application of the rules regarding expert testimony in the instant case versus the manner in which the rules are applied in a criminal setting, nor have Defendants shown any.

*Hygh v. Jacobs*, 961 F.3d 359 (2d Cir. 1992) is instructive in setting forth the distinction between what is and is not acceptable in an expert report such as those presented here by Dr. Barrett:

> Under Rules 701 and 702, opinions must be helpful to the trier of fact and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers on an earlier day.

*Hygh*, 961 F.2d at 364. Unfortunately, portions of Dr. Barrett's Reports accomplish just that –
they tell the jury what result to reach. Defendants are correct that factual conclusions may be
included in an expert's testimony, even though those conclusions may embrace an ultimate
issue to be decided by the jury. *See Bilzerian,* 926 F.2d at 1294. However, and to the contrary,
opinions embodying legal conclusions which "encroach upon the court's duty to instruct on the
law" are not admissible. *Id.* (citing *Scop*, 846 F.2d at 142); *see also DiBella v. Hopkins*, No. 01
Civ. 11779, 2002 WL 31427362, at * 4 (S.D.N.Y. Oct. 30,2002), *aff'd*, 403 F.3d 102 (2d Cir.
2005) (expert precluded from testifying where report undertook to tell the jury what result to
reach). This is precisely the boundary which Dr. Barrett's Reports improperly cross,
particularly where Dr. Barrett concludes that certain criteria examined by him result in a
finding that there is no violation of the Equal Pay Act. The Reports blur the line between
industry practice and an opinion on the legality of Defendants' conduct.

Rule 704 "was not intended to allow experts to offer opinions embodying legal
conclusions." *Scop*, 846 F.2d at 139. Nor may an expert witness "offer opinions on relevant
events based on their personal assessment of the credibility of another witness's testimony."
*Id.* at 142. Witness credibility is "exclusively for the determination by the jury." *Id*. To the
extent that such an assessment is presented by Dr. Barrett, that information is also precluded.

Having carefully reviewed both Reports compiled by Dr. Barrett, portions of his
deposition testimony, and the arguments put forth by respective counsel, the Court concludes
that portions of both Reports as well as the testimony proffer legal principles underlying the
Equal Pay Act and the application of those principles to the job titles at issue in this case. As
such, this information has the clear potential to usurp the role of the trial judge in instructing

the jury as to the applicable law or invade the jury's province in applying the law to the facts. For these reasons, neither the testimony nor the statements in the Reports referenced at length above are properly admissible. To this extent, Plaintiffs' motion to strike in GRANTED.

### B. The Motion to Strike

Plaintiffs seek to strike the entirety of Dr. Barrett's Reports as well as his testimony. Dr. Barrett is clearly precluded from testifying about the topics set forth in Section V(A) above. Courts within this Circuit have not hesitated to preclude expert reports and testimony that "embod[ied] legal conclusions [and] exceeded the permissible scope of opinion testimony under the Federal Rules of Evidence." *Scop*, 846 F.2d at 138-40 (finding that an expert witness's testimony that defendants engaged in a "manipulative and fraudulent scheme" within the meaning of federal securities laws constituted "legal conclusions that were highly prejudicial and went well beyond his province as an expert in securities trading"), *modified on other grounds*, 856 F.2d 5 (2d Cir.1988); *accord United States v. Stewart*, 433 F.3d 273, 311-12 (2d Cir. 2006) (finding no error in excluding expert testimony "regarding the legal principles underlying insider trading and their application to Stewart's trade"); *Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 709 (2d Cir. 1989) (expert testimony that defendant was "negligent" was improper in a personal injury action).

Where Dr. Barrett focuses on topics such as the work performed in the respective job titles and compares the skill, effort, responsibility and working conditions of those jobs, the remaining portions of his Report and testimony can prove helpful to jurors. To that extent, the Court does not see a need to "throw out the baby with the bath water." By way of limited

example only, Section IV of the Initial Report which entails a discussion of the job duties of the PCO and FCT I positions does not run afoul of the Rules by drawing legal conclusions or invading the jury's province in applying the law to the fact.  It is not unusual for district courts within the Second Circuit to strike parts of an expert's report and testimony and to retain others.  *See, e.g., Great White Bear, LLC v. Mervyns, LLC*, No. 06 Civ. 13358, 2008 WL 2220662, at * 3 (S.D.N.Y.  May 27, 2008) (striking only certain portions of expert report); *Cerbelli v. City of New York*, No. 99 CV  6846, 2006 WL 2792755, at *1 (E.D.N.Y. Sept. 27, 2006) (granting in part the defendants' motion to preclude portions of experts' reports and testimony); *Rieger v. Orlor, Inc.,* 427 F. Supp.2d 99, 101 (D. Conn. 2006) (granting defendants' motion to preclude majority, but not all, of report of plaintiff's expert where opinions rendered included legal conclusions which impermissibly invaded jury's province.); *Weschler v. Hunt Health Systems, Ltd*., 381 F. Supp. 2d 125, 156-158 (S.D.N.Y. 2003) (striking portions of expert's supplemental report).

For these reasons, the motion to strike the entirety of Dr. Barrett's Reports and his testimony is DENIED.  In order for the non-violative portions of Dr. Barrett's Reports and testimony to be admissible at trial, they must be amended in accordance with the provisions of this Memorandum and Order to remove the impermissible legal analysis and conclusions as outlined here.

## C.      Scope of Rebuttal

Plaintiffs contend "Dr. Barrett's rebuttal report impermissibly includes a wealth of argument and opinions which should have been included in his initial expert report and which would have been subject to rebuttal by plaintiff's expert." Pl. Mem. at 10. Included in this material, according to Plaintiffs, are new tables (Rep. II at 21), methodologies (*id.* at 23), and theories (*id.* at 28). Plaintiffs add that the rebuttal report improperly "lists sixteen topics on which he asserts Dr. Lundquist failed to express an opinion." Pl. Mem. at 10. According to Plaintiff, as this "is new material and not rebuttal, it must be stricken from [Dr. Barrett's] rebuttal report." *Id.* at 11.

Rule 26(a)(2)(B)(I) requires that an expert's initial report contain "a complete statement of all opinions the witness will express and the basis and reasons for them," while Rule 26(a)(2)(C)(ii) allows the admission of rebuttal testimony that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party . . . ." "A rebuttal expert report is not the proper 'place for presenting new arguments, unless presenting those arguments is substantially justified and causes no prejudice.'" *STS Software Systems, LTD. v. Witness Systems, Inc.*, No. 1:04-CV-2111, 2008 WL 660325, at *2 (N.D. Ga. Mar. 6, 2008) (quoting *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, No. 03 C 7713, 2005 WL 1300763, at *2 (N.D. Ill. Feb. 22, 2005)); *accord Jorgenson Forge Corp. v. Consarc Corp.*, No. C00-1879Z, 2002 WL 34363668, at *1 (W.D. Wash. Jan. 9, 2002) (excluding rebuttal testimony that went "well beyond the scope of the Plaintiff's expert reports and introduces new opinions"); *Ritch v. AM Gen'l Corp.*, No. Civ. 93-451-SD, 1997 WL 834214, at *1 (D.N.H.

Nov. 17, 1997) (noting that "an expert's rebuttal testimony may not go too far beyond the scope of the report submitted with the original disclosure").

Defendants have provided no justification for Dr. Barrett's omission of these opinions in his Initial Report, as required by Rule 26(a)(2)(B). "This court has broad discretion when determining if a discovery violation is harmless or justified," and is guided in the exercise of its discretion by the following four factors: (1) the prejudice to the opposing party; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith involved. *Baldwin Graphic Systems, Inc.*, 2005 WL 1300763 at *1 (quoting *David v. Caterpillar*, 324 F.3d 851, 857 (7th Cir. 2003)). The Court finds that Plaintiff is prejudiced by the very fact that Dr. Lundquist did not have an opportunity to respond to the new material contained in Dr. Barrett's Rebuttal Report and Defendants took no steps to cure this prejudice. *See STS Software Systems, LTD*, 2008 WL 660325 at *2. While there may be no direct disruption of trial, this prejudice cannot be cured by further discovery at this juncture. The Court notes that discovery closed some time ago and the parties have already fully briefed Defendants' motion for summary judgment. Finally, while Defendants may not have acted in "bad faith," the Court finds that their submission of Dr. Barrett's Rebuttal Report containing this new material was "not inadvertent." *See Baldwin Graphic Systems, Inc.*, 2005 WL 1300763 at *2. In the Court's discretion, therefore, Plaintiffs' motion to strike the newly added portions of the Rebuttal Report that should have been disclosed in the Initial Report is GRANTED.

## VI.   Conclusion

For all of the foregoing reasons, Plaintiffs' motion to strike the reports and testimony of

Defendants' expert is GRANTED, in part, and DENIED, in part, as follows:

- Plaintiffs' motion to strike the inadmissible portions of the reports and testimony of Defendants' expert, as specifically designated herein, is GRANTED;

- Plaintiffs' motion to strike the entirety of the reports and testimony of Defendants' expert is DENIED;

- Plaintiffs' motion to strike the newly added portions of Dr. Barrett's Rebuttal Report that should have been disclosed in the Initial Report is GRANTED.

- Defendants' expert is directed to amend the Initial and Rebuttal Reports to conform with the provisions of this Memorandum and Order.

**SO ORDERED.**

Dated:  Central Islip, New York
      September 26, 2008

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge